438

SOL A. DANN et al.,
Plaintiffs,

*vs.*

CHRYSLER CORPORATION, a corporation of the State of Delaware, et al.,
Defendants.

MARY L. GALLO AND A. JAMES GALLO,
Plaintiffs,

*vs.*

PAUL C. ACKERMAN et al.,
Defendants.

Civ. A. Nos. 1330, 1585.

*Court of Chancery of Delaware, December 31, 1963.*

*Motions for Reargument Denied February 7, 1964.*

*Daniel O. Hastings, Clarence W. Taylor* and *Russell J. Willard, Jr.,* of Hastings, Taylor & Willard, Wilmington; *Lewis M. Dabney, Jr.,* and *Herbert Robinson,* New York City; and *Frank Rosenbaum* of Dann, Rosenbaum, Bloom & Kaufman of Detroit, Michigan, for plaintiffs in Civil Action No. 1330, Sol. A. Dann and others.

*William E. Taylor, Jr.,* of Wilmington; *Norman S. Nemser* and *Stanley Nemser,* of Nemser & Nemser, New York City; and *Irving Steinman,* New York City, for plaintiffs in Civil Action No. 1585, Mary L. Gallo and A. James Gallo.

*Aaron Finger* and *Robert H. Richards, Jr.,* of Richards, Layton & Finger, Wilmington, and *Milton Pollack,* New York City for defendant, Chrysler Corporation in Civil Actions Nos. 1330 and 1585.

*Richard F. Corroon,* of Berl, Potter & Anderson, Wilmington; *David W. Peck* and *Harold T. Milman,* of Sullivan & Cromwell, New York City, for defendants, Jones, Brady, Dodge, Love, McCollum, McElroy, McNeill, Page, Trippe and Warren in Civil Action No. 1330 and defendants, Van Bomel, Coleman, Love, McNeill, Dodge and Estate of W. A. Jones in Civil Action No. 1585.

*Daniel L. Herrmann,* of Herrmann, Bayard, Brill & Russell, Wilmington and *Robert Ehrenbard,* of Kelley, Drye, Newhall, Maginnes & Warren, New York City, for defendants Ackerman, Bright and Laughna in Civil Action No. 1330 and defendants, Ackerman and Bright in Civil Action No. 1585.

*S. Samuel Arsht,* of Morris, Nichols, Arsht & Tunnell, Wilmington, and *Robert Ehrenbard* and *Francis S. Bensel,* of Kelley, Drye, Newhall, Maginnes & Warren, New York City, for defendants, Colbert, Jacobson, Leary, Misch, Quinn, Row, Townsend and Woolson in Civil Action No. 1330 and defendants, Colbert, Leary, Misch, Quinn, Townsend, Woolson and Zeder in Civil Action No. 1585.

*Clyde M. England, Jr.,* of Killoran & VanBrunt, Wilmington, for defendant, K. T. Keller in Civil Actions Nos. 1330 and 1585.

*John J. Morris, Jr.,* of Morris, James, Hitchens & Williams, Wilmington, for defendant, NAFI Corp.

*Albert W. James* and *Arthur J. Sullivan,* of Morris, James, Hitchens & Williams, Wilmington, for defendant, Jack W. Minor in Civil Actions Nos. 1330 and 1585.

*Howard M. Handelman,* Wilmington, and *Norman Annenberg,* New York City, for objector, Erwin H. Ezzes.

*Irving Morris* and *Joseph A. Rosenthal,* of Cohen & Morris, Wilmington, for objectants, Judson, Cassady and Seeman, Executrices, and objectant, Sandler.

*Frank J. Miller*, of Walker, Miller & Wakefield, Wilmington, for intervenor, Herman Koenigsberg.

*I. Walton Bader*, of Bader & Bader, New York City for objector, Arthur Hoffman.

*Aubrey B. Lank*, of Theisen & Lank, Wilmington, amicus curiae.

SEITZ, Chancellor: This is the decision after hearing on the fairness of a proposed settlement of two derivative actions.

The first action was commenced by one Sol A. Dann and other stockholders against Chrysler Corporation ("Chrysler"), various directors and officers as well as certain suppliers of Chrysler. This action will be referred to as the "Dann action."

The Dann action was commenced in August 1960, and involved some twelve causes of action. After certain pleading skirmishes (See *Dann v. Chrysler Corp.*, 39 *Del.Ch.* 437, 166 *A.2d* 431, 40 *Del.Ch.* 103, 174 *A.2d* 696), a consolidated amended complaint was filed consisting of some 109 pages embracing fifteen causes of action and about sixty separate claims. Certain of the defendants thereafter served their renewed motions to dismiss or in the alternative for a more definite statement. The so-called Keller defendants served their motion to dismiss or for summary judgment. The defendant John W. Minor and the defendant NAFI Corporation (the only appearing supplier) filed answers denying the charges asserted against them. The defendant Robert P. Laughna filed a motion to strike and to dismiss parts of the complaint.

All the motions to dismiss were based largely on the contention that the plaintiffs could not amend their complaint so as to assert new causes of action as to those non-resident defendants who had appeared generally following the sequestration of their property. Certain motions also questioned whether the allegations were set forth with sufficient particularity. The Keller defendants raised the defense of statute of limitations.

In February 1962, Mary and James Gallo filed a derivative action against Chrysler and the then directors and certain past officers of Chrysler charging many of the same acts, omissions, and "frauds" as were alleged in the Dann complaint.

In June 1962, this court entered an order consolidating the Dann and Gallo actions solely for the purpose of discussing a possible settlement. The time fixed was subsequently extended at the request of the parties.

In the meantime (between 1960 and March 1963), four stockholder actions were commenced outside the State of Delaware embracing some of the same causes of action—two in the New York Supreme Court, one in the Federal District Court for the Southern District of New York and one in the Federal District Court for the Eastern District of Michigan. Also, Chrysler commenced a libel action against Dann in the Delaware Superior Court.

On March 6, 1963, a stipulation of settlement was filed. To facilitate the settlement a final amendment was filed by the Dann plaintiffs adding two additional causes of action which, it is suggested, incorporate the additional charges found in the New York and Michigan actions. The stipulation of settlement provides, inter alia, that all the derivative actions shall be dismissed with prejudice against all the defendants except the defendant W. C. Newberg. As to Newberg the dismissal will be without prejudice. Such fees and disbursements as the court may allow to plaintiffs shall be paid by Chrysler.

Under the terms of the stipulation of settlement, if approved, each of the individual defendants who is a party to the stipulation and all past or present directors of Chrysler, except the defendant Newberg, will receive a release discharging each of them from any and all claims arising out of the matters alleged in the complaint and all amendments thereto both in the actions brought in this court and the "companion" actions in the New York state and federal courts. Also, the individual defendants who are parties to the stipulation will seek indemnity for their attorneys' fees incurred in connection with these actions.

On March 6, 1963, a court-approved notice of hearing on the stipulation of settlement was mailed to all stockholders. A proxy statement was simultaneously transmitted to the stockholders proposing the adoption of a modification in Chrysler's incentive compensation plan. The following language is contained therein:

"Since the modification of the formula for computing the total provision that may be made for incentive compensation awards is a principal term of settlement and is necessary if the settlement is to be put into effect, a vote in favor of amending the 1956 stockholders' resolution to change the incentive compensation formula will, in effect, be a vote in favor of the settlement."

At a special meeting of the stockholders held on April 16, 1963, out of a total of 9,083,502 shares outstanding and entitled to vote, 6,699,016 shares were voted in favor of and 144,240 against the proposed modification.

The court also appointed an amicus to report, inter alia on "What appear to be the issues relevant to the hearing on the proposed settlement and the proof which might be of assistance to the court." This elaborate and helpful report was filed and was made available to all interested parties before the hearing. In particular, it discussed and analyzed the evidence of record relevant to the various issues and suggested other areas which might need elaboration.

Several stockholders filed objections, and the matter was tried at some length. The objecting stockholders are identified collectively herein as "objectors," unless more particular identification is desirable.

This is the decision on the "fairness of the settlement" after hearing and elaborate briefing.

Before the specific issues are considered, a little background is in order. Chrysler, a Delaware corporation, employs directly or through its subsidiaries in the United States approximately 77,000 people. It manufactures and sells passenger automobiles and commercial cars and trucks both here and abroad. It is the third largest manufacturer of such vehicles in the United States. It also manufactures assorted products of some substance including defense materials.

I turn now to the terms of the settlement and their relationship to the causes asserted.

The "consideration" offered in exchange for the releases and dismissal of the causes of action is a modification of Chrysler's present

incentive compensation plan for its employees. The details of the present plan and the proposed changes are discussed more fully later herein. The Dann plaintiffs' attorneys also urge that the changes in Chrysler's management personnel (referred to later herein as a "change in management") which occurred both prior to and during the pendency of these suits, are attributable to the activities of the plaintiffs or their attorneys. They contend that such changes effectuated one of the principal purposes of the litigation and that they provide in and of themselves a sufficient basis for approving the settlement.

The proponents agreed that the stipulation of settlement and the proposed modification of the present incentive compensation plan should not become operative until the modification was approved by Chrysler's board and by its stockholders and final approval of the settlement was granted by this court. Final settlement was also conditioned upon dismissal of the lawsuit instituted by Dann in the Federal District Court in Michigan against Chrysler and the giving of mutual releases between Dann and Chrysler of claims and counterclaims involved in the libel action filed by Chrysler against Dann in the Superior Court in Delaware plus the payment of $20,000 and disbursements to Dann's separate counsel therein.

In the stipulation all the named defendants (except Newberg) deny liability under any of the causes of action but agree that the expense of further litigation and the probable expenditure of time on the part of Chrysler's employees, officers, and directors make it desirable that the litigation be terminated without further proceedings. Plaintiffs state that the "significant and steady progress in all phases of Chrysler's operations under new management * * * with the estimated benefits which will flow to Chrysler and its stockholders by reason of the amendment to the Incentive Compensation Plan" can be considered an achievement of the objectives of the litigation. Thus, they state that they believe that settlement on the proposed terms is much to be preferred to continuation of the litigation and is in the best interests of Chrysler and its stockholders.

In the court-ordered notice of hearing which was sent to the stockholders, plaintiffs' attorneys made certain representations with respect to plaintiffs' ability to recover on the alleged causes of action.

These causes of action were divided by them into three categories: "(1) charges that certain past and present directors and/or officers of Chrysler have been financially interested in Chrysler suppliers and have personally profited from transactions between Chrysler and suppliers; (2) charges of mismanagement by defendants as directors and officers of Chrysler during the years 1956 to 1961; and (3) charges relating to the Incentive Compensation and Stock Option plans of Chrysler including allegations that they were not soundly devised and provided rewards out of proportion to the performance required to gain the rewards and should be appropriately revised."

Plaintiffs' attorneys further stated in the notice that while they felt that inquiry into the alleged instances of wrongdoing was warranted, they had concluded that the evidence gathered did not sustain the charges of personal interest and personal profits on the part of the defendants, except in a few instances discussed in the notice, and would not permit successful prosecution of the charges. Next, plaintiffs' attorneys acknowledged that the charges of mismanagement against the named defendants lay primarily in the area of business judgment and that the burden of proving culpability was too great to promise success in the prosecution of such charges.

Plaintiffs' attorneys stated finally that they believed their complaint concerning the "fairness" of the incentive compensation plan was well grounded and that a revision in such plan in accordance with their suggestions should be made. The revision or modification negotiated by plaintiffs' attorneys with the directors of Chrysler is said to meet these "suggestions" in that no compensation may be awarded under the new plan until higher earnings are achieved by the corporation but a higher rate of participation is permitted once these higher levels of earnings are achieved. As to the stock option plan, plaintiffs' attorneys noted that the directors of Chrysler had already made certain changes therein.

The proponents of the settlement all contend that the agreed terms are fair and beneficial to Chrysler and ought to receive the approval of the court. The defendants, however, deny that the change in Chrysler's management and the "changes and improvements in Chrysler which have occurred subsequent to commencement of the

activities of plaintiffs" are, as contended by plaintiffs' attorneys, attributable to the plaintiffs.

The objectors who have formally appeared herein take the position that the court should refuse to approve the proposed settlement on the ground that it is "unfair" to Chrysler's stockholders. The heart of their contention is that in practical effect Chrysler will receive nothing of tangible benefit as a result of the settlement, and indeed may be giving up a present advantage, while in return it will be required to deliver a release from all further liability to each of the named individual defendants except Newberg. Except for the objector Ezzes (and perhaps Koenigsberg as later considered), the objectors do not urge that there is in fact merit in any of the causes of action set forth in the amended complaints sufficient to permit a recovery thereon. Thus, they do not suggest that the "consideration" offered in return for the releases is "inadequate." Rather they contend that the proposed modification of the incentive compensation plan is merely a device agreed upon by the proponents by which the defendants may avoid what plaintiffs' attorneys are said virtually to concede are worthless claims. Thus, in the view of the objectors, the proposed settlement will have the effect, inter alia, of committing the corporation to a radical change in its incentive compensation arrangement, such change having resulted not from an untrammelled exercise of discretion on the part of the directors and stockholders but from the necessity of finding a basis for settling the lawsuit.

A further and separate objection they say is the fact that the proposed modification of the incentive compensation plan, if instituted, will result in the authorization of greater dollar payments to Chrysler's employees under such plan than are presently permitted. Thus, they contend, no "benefit" can assuredly be said to pass to Chrysler as a result of the proposed settlement beyond the termination of the existing lawsuits with the consequent elimination of express and unfavorable publicity and an end to the distraction of Chrysler personnel from their corporate duties.

Parenthetically, defendants' attorneys meet these objections to the settlement head on. They of course agree that the claims are worthless, and they concede that the modification of the incentive compensa-

tion plan if approved will authorize larger payments to Chrysler executives, a number of whom are defendants herein, if the requisite earnings exist. They admit that Chrysler's directors were anxious to terminate the litigation in order to avoid further expense and embarrassment to the corporation and "were willing to consider any honorable and proper way to get these suits out of the way."

They contend, however, that as a practical matter the corporation has nothing to gain from a continuation of the litigation and that it faces the prospect of further losses in time, good will, and expense. They urge that the modified incentive compensation plan will be an improvement over the old plan, since net earnings will have to be higher before the beneficiaries become entitled to the same dollar amounts of compensation as they would have been under the existing plan.

The defendants consider immaterial the fact that a number of them will be in a position to receive a greater dollar amount of incentive compensation for the year 1963 under the proposed plan than under the old plan. This they say is the result of Chrysler's financial success in the 1963 fiscal year and merely fulfills the purpose of the modified plan to give greater rewards for greater corporate success. They emphasize the fact that the stockholders as well as the directors approved the modification after being explicitly informed that approval was a vote in favor of the proposed settlement. Defendants' attorneys urge that even if there is doubt that the modified incentive compensation plan is better than the old plan, still the court should approve the settlement since the interests of Chrysler can best be served by terminating the litigation.

Should the court approve the settlement on the basis of the terms agreed upon by the proponents and approved in effect by the holders of a vast majority of the stock by virtue of their affirmative vote on the modification of the existing incentive compensation plan?

I should note preliminarily that the objector Ezzes charges that the 1963 proxy statement was tainted with fraud. This charge is based on the claim that the statement did not adequately or fully

describe the nature of the claims and the effect of the proposed settlement. I find no merit to these charges.

Unlike the other objectors, Ezzes alone claims that there is in fact merit in many of the causes of action asserted in the Dann and Gallo complaints. He contends that the proposed settlement should not be approved by the court, because the consideration offered by the defendants in exchange for releases is wholly inadequate in view of the potential recovery by the corporation.

Before dealing with specific objections it would seem desirable to mention the record which is used as the basis for deciding this matter. The plaintiffs agreed to the terms of the settlement on the condition that they be permitted to have reasonable discovery so as to make a judgment as to whether the other claims had sufficient merit to negate the fairness of the proposed settlement. Rather elaborate discovery was undertaken. It resulted in the representation by plaintiffs in the notice to stockholders of the proposed settlement that except for the incentive compensation plan cause of action the other causes could not be successfully pursued. It is obvious, with all due regard for the integrity of counsel, that the approach taken is, at a minimum, subject to the possibility of real abuse. The court took this into consideration in passing upon the objectors' requests for further discovery. In addition the court gave counsel for the various objectors an opportunity at the hearing to interrogate certain of the knowledgeable defendants and other witnesses whom the court required to appear for the purpose of testifying to a number of these matters. I have concluded that the record is sufficient for present purposes.

The objector Ezzes claims that a number of the causes of action have merit. He so contends with respect to alleged frauds on the part of Chrysler's management in administering Chrysler's incentive compensation plan. Strictly speaking, a number of these allegedly valid claims do not fall within the confines of the incentive compensation causes of action asserted in the Dann and Gallo complaints. The notice to the stockholders of the hearing on the settlement contains the following language:

"In plaintiffs' discovery proceedings herein, the documents relating to the incentive compensation plan were marked as exhibits. In view of their examination into their charges against individual officers and employees of Chrysler, plaintiffs' attorneys have concluded that although there is an issue as to fairness of the existing plan, there was no invalidity in its adoption, or impropriety in the application of or calculations under the plan or any improper award of benefits thereunder except for any possible claim that Chrysler may have against Newberg. Pursuant to the stipulation of settlement of these actions, a modification of the plan as hereinafter more fully described, negotiated by plaintiffs' attorneys, will be submitted for stockholder approval."

I propose to resolve any doubt by treating each of the allegedly valid causes of action asserted by the objector as if they fell within the confines of the allegations of the complaints. I note in passing that of all the claims originally asserted by the plaintiffs only the issue as to the "fairness" of the existing (1956) plan is said to have merit in connection with the defendants who join in the settlement proposal. I observe further that nowhere in the notice to stockholders or in plaintiffs' briefs is the precise nature of the alleged unfairness in the plan spelled out.

Three of the Ezzes objections are directed toward allegedly improper practices under the 1929 Chrysler incentive compensation plan and the allegedly fraudulent adoption of the 1956 plan.

The history of Chrysler's incentive compensation plan, commencing in 1929, forms the background for these contentions of the objector. On April 16, 1929, Chrysler stockholders authorized the payment of incentive compensation in the following language:

"This corporation may incur obligations on account of such profit sharing plans and bonus plans, provided said expenditures for any calendar year * * * shall not exceed for said year six and one half percent (6½%)[1] of the *net earnings of the Corporation for that year* * * *." (Emphasis added)

1. By resolution of the Board of Directors adopted February 23, 1941, this percentage was reduced to five per cent.

Computation of incentive compensation for the period 1929 to 1955 was governed by the 1929 resolution set out above, which provides for the application of a percentage figure to the "net earnings of the Corporation." The proponents of the settlement concede that from 1929 to 1939 the "net earnings" against which the percentage was applied was a consolidation of the earnings of Chrysler and all wholly-owned subsidiaries, domestic, Canadian, and foreign. From 1940 to 1953, however, Canadian and other foreign subsidiaries were not consolidated for incentive compensation purposes. Beginning in 1954, Canadian and foreign subsidiaries were once against consolidated. A comprehensive revision of existing incentive compensation plans was effected by the stockholders' resolution of April 17, 1956, which remains in force at the present time. The pertinent language of that resolution follows:

"* * * this Corporation may incur obligations on account of Incentive Plans, provided the provision out of earnings for any fiscal year of the Corporation for all Incentive Plans then in effect * * * shall not exceed five per cent (5%) (as computed by the independent Auditors of the Corporation) of the *Consolidated Net Earnings for that fiscal year (as reported in the Annual Report to the stockholders) of the Corporation and such of its subsidiaries as are consolidated in its annual statements * * *.*" (emphasis added)

The Ezzes objections on these matters are first that during the period 1929–1955, payments of incentive compensation were based on computations of consolidated net earnings when in fact they should have been based on the net earnings of Chrysler alone; next, that the 1956 stockholders' resolution relating to incentive compensation "changed" the basis for payments of such compensation to consolidated net earnings though the proxy statement failed to reveal that the 1929 formula did not permit consolidation; and finally, that during the period the 1929 formula was in force, the method of computation was improperly altered from time to time.

The defendants' answer to these objections is that the 1956 stockholders' resolution, as indicated in the proxy statement, merely restated the practices that had been adopted under the 1929 resolution

and did not fundamentally change them although funded debt was added to the capital base. Thus, the following statement is found in the 1956 proxy statement: "The proposed amendment generally revises the resolution of 1929 so as to eliminate what has become obsolete and to adapt the language to present-day accounting terminology". The defendants point out that the consolidation of wholly-owned subsidiaries for incentive compensation purposes, which is expressly authorized by the 1956 resolution, had always been Chrysler's practice though the 1929 formula only refers to "net earnings of the Corporation." Also, the earnings figures which have been used for incentive compensation purposes have been those shown in the annual reports to stockholders, though no reference is made in the 1929 resolution to annual reports of earnings.

The defendants say that foreign subsidiaries were not included in the consolidated financial statements in the annual reports to stockholders for the years 1940 through 1953, because of exchange restrictions and war-time conditions in foreign countries. They contend that this situation was explained to the stockholders in the annual report for the year 1940, although that report is not part of the hearing record. Thus, they urge that the practice of basing compensation on the financial statements appearing in the annual reports to stockholders was consistently followed throughout the period 1929 to 1955.

What assessment may be made of these supposed causes of action said to exist against some of the defendants herein? The court's responsibility at this stage is merely to evaluate the probability of success if these issues were ultimately litigated and not to make a final determination. *Krinsky v. Helfand,* 38 *Del.Ch.* 553, 156 *A.2d* 90.

Turning then to the above contentions of the objector Ezzes, I am satisfied that the likelihood of success on any of these claims is very small. The defenses of laches or limitations might well be applicable to each of these claims. Moreover, assuming that Chrysler reported its earnings to its stockholders on a consolidated basis prior to the institution of the 1929 plan, no valid objection could probably be raised to the interpretation of the language of the 1929 formula adopted by the persons charged with implementing such plan. A very similar situation is presented in *Meyers v. Cowdin, Sup.,* 47 *N.Y.S.2d* 471,

where the New York court in dismissing the complaint after trial noted that the earnings of the corporation there involved had always been reported to the stockholders on a consolidated basis. It concluded therefore that payments of incentive compensation based on such consolidated earnings were not improper though the formula provided for payments based on "net earnings of the Company".

Next, I think that the objector's claim that the stockholders' resolution of 1956 was induced by fraud is without substance. It is conceded that incentive payments for the period 1929 to 1955 were based on the consolidated earnings of Chrysler and its wholly-owned subsidiaries as reported to the stockholders. It follows therefore that there was no misrepresentation or inadequate disclosure when the 1956 proxy statement stated that the purpose of the revision, which I find made no change of any real substance in the existing plan, was "to adapt the language to present-day accounting terminology".

Next, I turn to the objector's claim that the persons charged with implementing the plan improperly altered computation practices without regard for the language of the various stockholders' resolutions. I note first in evaluating this claim that there is no showing that the corporation or its stockholders were damaged by any of these alleged alterations.

The objector points principally to the exclusion of Chrysler's wholly-owned foreign subsidiaries from consolidated earnings during the period 1940 to 1953. The defendants claim, however, that the practice of excluding such subsidiaries and the reasons therefor were explained to the stockholders in the 1940 annual report and that such information was filed with the S. E. C. I am satisfied that little success could be anticipated if this issue were litigated, since payments during this period were admittedly based on consolidated net earnings as reported in the annual reports to stockholders. There is no showing whatever that the alteration in the method of consolidation violated sound accounting principles, nor does the objector refute defendants' assertion that the allegedly improper alteration was fully disclosed to the stockholders.

The objector claims that there were other improper alterations in computation practices with respect to wholly-owned retail selling and leasing subsidiaries and so-called forfeitures. These claims appear to be wholly without merit. I merely note in passing, first, that the allegedly improper treatment accorded forfeitures served to reduce rather than increase the fund available for incentive compensation and, next, that the earnings of the selling and leasing subsidiaries were consolidated, in effect, with the earnings of the other subsidiaries in the annual reports to stockholders.

The objector Ezzes next complains that payments in 1955, 1957, 1960, and 1962 were improper because the language of the plan was misinterpreted so as to inflate the fund available for incentive compensation payments. The first matter under this head concerns the inclusion of state and local income taxes in 1962 as part of the fund from which "set aside" was deducted. The 1956 plan expressly permits the inclusion of "taxes on income". The objector contends, however, that the 1929 plan only permitted the inclusion of *federal* taxes on income and that the 1956 proxy statement implied the 1956 plan would continue on the same basis.

There are several reasons why in my opinion the probability of success on this issue is small. First, there is nothing in the 1956 proxy statement that can be said to constitute a representation that the phrase "taxes on income" in the 1956 plan was to have the same meaning as "Federal taxes" in the 1929 plan. The most that may be said is that the amended language introduced a potential ambiguity in view of the former practice. Certainly this was an area where those in charge of implementing the plan were entitled to exercise their sound discretion. Also, I note that in November 1962, inquiry with respect to the proper interpretation of the language of the plan was directed to legal counsel by Chrysler's auditors. In reply, it was specifically stated that the language here in issue included state and local as well as federal income taxes. Thus, considering the factors relevant to the proper interpretation of this language, I think the likelihood of recovery from any of the defendants of the alleged overpayments for the year 1962 would be remote.

The objector next raises objection to the interpretations of certain portions of the plan which are found in the reply by legal counsel to Chrysler's auditors. I pause here merely to note that the objector disagrees with such interpretations. However, he does not point to any specific instance where payments were based on these allegedly erroneous interpretations of the plan. Thus, assuming that he were correct, there is nothing on which a recovery by the corporation could be based. I add, however, in order to avoid clouding this issue, that the interpretation placed on the language in issue by counsel seems fair and reasonable. I conclude therefore that prosecution of this claim would probably be fruitless.

The objector claims that the 1956 plan is invalid: (1) because incentive compensation can be based on non-operating income, (2) because loss years are not averaged with profitable years, (3) because the compensation percentage is applied to before-tax rather than after-tax earnings, and (4) because compensation is based on net earnings as reported to stockholders rather than net earnings as reported to the federal government for tax purposes. I can only say that no authority is cited which suggests than any one of these reasons per se renders the incentive compensation plan invalid. At bottom, these objections are directed to the form of plan which the directors and stockholders voted to adopt. It may well be that some plan other than the one adopted would better accomplish the objectives of an incentive plan. But that of course is not for this court to say. I am satisfied that the contentions of the objector under this head offer no legal basis for attacking the 1956 plan.

The objector Ezzes also contends that all stock options issued after 1956 were invalidly issued in violation of the stockholders' resolution of April 17, 1956. I think it clear that the limitations placed in the resolution authorizing payments under "Incentive Plans" have no bearing on the issuance of stock options and that such options were not invalidly issued. While a stock option plan may indeed be considered an incentive plan, it is readily apparent that the term "Incentive Plans" appearing in the 1956 proxy statement and stockholders' resolution was not intended to and did not refer to the Chrysler Stock Option Plan.

Next, the objector claims that the cancellation of certain options in 1958 and 1959 and their reissuance at lower option prices constituted a waste of assets for which the recipients are liable. The 1959 proxy statement makes it clear that the granting of the new options, conditioned upon surrender of the old, was undertaken by the Stock Option Committee of Chrysler which was composed of directors not eligible to receive options. Each of these new options could be exercised by the holder only if he remained continuously in the employ of Chrysler or its subsidiaries for at least eighteen months after the date of its grant. The action of the Stock Option Committee was approved by the Board of Directors and by the stockholders.

The objector contends that the reissuance of stock options at lower prices constitutes a gift or waste of assets, since the committee action was taken only when it was made clear that there would be a net loss in earnings during 1958 thereby depriving certain of the defendants of incentive compensation for 1958. He also contends, citing certain magazine and law review articles, that the reissuance of stock options at lower prices ought not be permitted, since such action in effect excuses poor corporate performance.

A number of Delaware decisions I think support the view that where stock options are granted by a disinterested committee with the approval of the directors and stockholders and where the optionee is required to remain in the employ of the corporation for an extended period of time, no legal attack may successfully be made upon such options. See, e. g., *Gottlieb v. Heyden Chemical Corporation,* 33 *Del.Ch.* 177, 91 *A.2d* 57; *Beard v. Elster,* 39 *Del.Ch.* 153, 160 *A.2d* 731. One may have difficulty reconciling the practice of reissuing options at lower prices with the "incentive" aspect of the earlier grants. Nevertheless, the court would not be inclined to block reasonable corporate action in this area, particularly in view of the need of corporations to retain talented personnel.

I conclude therefore that the probability of success if this issue were ultimately litigated would under the circumstances be small.

The objector next attacks the "revolving credit agreement" negotiated by Chrysler with a number of banks whereby Chrysler was

extended a credit commitment of $150,000,000. The commitment was obtained on June 12, 1958 and was continued until May 15, 1961. Although Chrysler never used the revolving credit, it nevertheless paid the sum of $2,157,533 to the participating banks during the period the commitment remained in effect.

The objector contends that six members of the nine-member Finance Committee that recommended the commitment were officers and directors of participating banks. All the members were present on June 12, 1958 when the matter was voted upon, and all voted except R. E. McNeill, Jr., President of the Hanover Bank, who had been the primary negotiator of the transaction. The Board of Directors of Chrysler voted upon the commitment at its meeting held the same day. Eighteen of the twenty-one directors were present. Of these eighteen, eight were associated with banks ultimately participating, and all voted except McNeill who nevertheless was present.

Article II, Section 9 of Chrysler's By-Laws provides that no director shall vote at a meeting of the Board on a question in which he is interested (with certain exceptions not relevant here) or be present while the same is being considered. Section 9 goes on to apply the same safeguards where a transaction between Chrysler and another corporation is involved and a director of Chrysler is a director or officer of such other corporation. The same limitation appears to be applicable to action taken by any committee of the corporation.

The objector contends that the presence of the interested directors at the meetings of the Finance Committee and the Board violated Section 9 of the By-Laws. He claims that by virtue of his position on the Stock Option Committee and Incentive Compensation Committee, McNeill had a "persuasive effect" on the other directors in obtaining their approval of the commitment. Next, he claims that Chrysler's undertaking was reckless and without diligence, since admittedly there were no studies on the subject of the revolving credit agreement before the Finance Committee or the Board at the time it was approved or while it remained in effect, though Chrysler never used the credit but continued paying for the availability of such credit. The objector seems to suggest that even if the initial credit agreement in 1958 was warranted by the circumstances then prevailing, the sub-

sequent improvement in Chrysler's Cash and Marketable Securities and Net Current Assets required reconsideration on the part of the Board. The objector attributes all these alleged wrongs resulting in payments by Chrysler of $2,157,533 over a three-year period to the conflict-of-interest situation in which certain of the directors found themselves.

The revolving credit agreement was the subject of the ninth Dann cause of action and the sixth Gallo cause of action. Much of the evidence relied upon by Ezzes in voicing his objection to the settlement of this claim was originally produced by the plaintiffs. In the notice to stockholders plaintiffs' attorneys summarized the claim and made the following statement:

> "Upon all the evidence plaintiffs' attorneys have concluded that the credit arrangement was fair and reasonable. Apart from the question whether a technical by-law violation might still be argued, plaintiffs' attorneys have concluded that these causes of action could not be sustained in the light of business considerations and the fact that there is no evidence that any director personally profited from the transaction."

In evaluating the prospects of success on this claim I assume without deciding that Section 9 of Chrysler's by-laws was violated by the fact that a number of "interested" directors were present and voted to approve the agreement. Does it follow that the directors involved are therefore liable for the amount expended by Chrysler for the availability of the credit? It is uncontradicted that Chrysler paid no more than the going rate for the commitment. Indeed, there is no "objective" evidence that the terms were unfair to Chrysler or that the participating directors were guilty of bad faith. The thrust of the Ezzes objection is that the interlocking directors, because of their conflict of interest, recklessly committed Chrysler to a credit commitment which it did not really need. I am of the opinion, however, that the evidence of record on this matter fully supports the view, even on the assumption that the defendants must bear the burden of proof, that the commitment was reasonably necessary for the purpose that it was intended to serve and that the need therefor was reviewed periodically and reaffirmed. Considering the background and experience of the members of Chrysler's board as well as the other evidence, I do not think the

absence of written studies is indicative of a lack of diligence on the part of the directors in approving the commitment or allowing it to continue. Thus, apart from the alleged by-law violation, I am satisfied that the defendants could successfully have vindicated their conduct.

What then is the legal effect of the violation of Section 9 of the By-Laws? Certainly such conduct gives just cause for apprehension, but it does not follow in my opinion that the defendants are therefore absolutely liable for the dollar amounts paid by Chrysler for the commitment. None of the defendant directors received any personal profit from the transaction, nor did Chrysler receive less than its "money's worth". It follows therefore that any sum these defendants are required to pay to Chrysler will be in the nature of punitive, as opposed to compensatory, damages.

There are instances where the court will impose such damages in order to vindicate a legislative or other public policy. Generally speaking, however, in the absence of fraud or bad faith, a court will not upset a transaction involving corporations having even a majority of directors in common where the transaction is shown to be fair. In the present case, less than a majority of the directors were associated with banks ultimately participating, and one cannot fairly say that undue influence was exerted as to the rest. I recognize that the utmost vigilance is required in a case such as this, but where a close scrutiny of the record fails to disclose any meaningful evidence of actual wrongdoing or damage to the corporation, the monetary worth of the claim is most dubious. I conclude from the foregoing that plaintiffs' attorneys were justified in stating that these causes of action could not be sustained.

I turn next to the objector's claim that the directors of Chrysler acted recklessly in purchasing a substantial minority interest in Simca prior to 1963. The objector does not contend that there was any conflict of interest involved in this transaction. Thus, in substance he is attacking a decision involving a business judgment on the part of the directors. I am satisfied from the record before the court that the evidence adduced in support of such claim is wholly inadequate to afford any hope of meeting the heavy legal burden imposed in this area.

Both Koenigsberg and Ezzes object to the proposed settlement with the defendant NAFI Corporation. NAFI was charged in the Dann complaint with having sold inferior textile materials to Chrysler at excessive prices and in greater quantities than were needed. The defendants K. T. Keller, Samuel Keller, and L. L. Colbert allegedly were "financially interested in and involved with NAFI Corporation" and caused Chrysler to make such purchases. NAFI denied the charges though it admitted that K. T. Keller had owned varying quantities of its common stock.

NAFI is not a defendant in the Gallo action though the charges are repeated in substance in the Gallo complaint.

Under the terms of the proposed settlement the claim against NAFI will be dismissed with prejudice. NAFI will not be required to pay a consideration in any form to Chrysler. No release will be given to NAFI.

The record shows that the stock owned by K. T. Keller in NAFI never exceeded 1.05% of the outstanding common stock of the corporation. Apart from that, the record is devoid of any evidence of wrongdoing on the part of this defendant in support of the alleged claims. The objector Ezzes charges that "the proponents willfully refrained from developing evidence sufficient to enable a proper evaluation of the NAFI cause of action." I am satisfied that the charge of "willfulness" on the part of the proponents is wholly unfounded and that the evidence adduced by the plaintiffs warranted their representation that they could not succeed in establishing that Chrysler had suffered any damages. Ezzes suggests an area where further evidence might have been sought by plaintiffs with respect to this cause of action. There is no showing by the objector, however, that any of this evidence if produced would have added substance to the alleged claim.

Next, the objector Koenigsberg seems merely to suggest that since NAFI is giving no consideration to Chrysler, the settlement should not be approved as to it. In view of the fact that both the plaintiffs and Chrysler agreed that the charges are unfounded and the record does not indicate anything to the contrary, I will approve the

proposed dismissal as to this defendant if the general settlement is approved.

Ezzes also claims that the plaintiffs willfully failed to produce evidence in support of the claims involving the so-called Consolidation Coal and National Steel transactions. Plaintiffs' attorneys represented in the notice that they had no evidence of any improprieties in these transactions. In my opinion such representations are fully supported by the extensive record on these matters. The objector says that further evidence should have been sought, but here, as in the NAFI transaction, there is no showing that the additional proof would add substance to these claims. This is particularly true because of the evidence adduced before the Court.

The claims by the objector Ezzes that the salaries paid to Colbert and K. T. Keller constitute "gifts" are without substance. There is no evidence of wrongdoing in the negotiation of either of these contracts, and the "proof" tendered in support of the charges of breech of contract offers meager hope of ultimate success on these claims.

One other claim needs mention here. The objector Koenigsberg urges that the claims against the defendants Minor and Colbert with regard to the so-called Taxi-Ad transaction should be dismissed without prejudice and that neither defendant should receive a release or be reimbursed for his expenses by Chrysler. The objector does not contend that a real promsie of success exists with respect to these claims. He states only that since neither defendant is presently an officer or director of Chrysler, neither can be said to have offered anything to Chrysler for settlement. He contends, however, that a "prima facie case" exists against Colbert.

After reviewing the evidence on this matter, I am satisfied, in view of Minor's relatively insignificant role in Chrysler's affairs and the disclosures involved, that no reason presently exists for not disposing of this claim as part of the general settlement.

Having weighed the claims asserted by the objector Ezzes to have merit and the possible defenses, I conclude that the probability of success in litigating any of such claims is so remote as to entitle them to practically no consideration in evaluating the fairness of the terms

of settlement. I turn then to the claims asserted by the plaintiffs herein. The only claim which the plaintiffs now contend has merit is that which relates to incentive compensation. Let us examine this claim.

The tenth Dann cause of action and the eighth Gallo cause of action as finally amended stated several "claims" relating to the present incentive compensation plan which was adopted by Chryslers' board and stockholders in 1956. These complaints alleged that the adoption of the plan was invalid and that the payments which were permitted thereunder were excessive and unconscionable. The formula was said to be improper because incentive compensation was permitted to be paid before the shareholders had obtained a reasonable return on their invested capital and because loss years were not set off against years in which there were profits in determining the availability of incentive compensation. Furthermore, plaintiffs claimed generally that payments had been inflated by miscalculations in applying the formula and by changes in accounting practices and policies. Finally, plaintiffs urged that as a matter of law officers found to be guilty of breaches of fiduciary duty to the corporation were not entitled to receive any incentive compensation whatever.

In the stipulation of settlement plaintiffs' attorneys represented that they had investigated the various claims under these causes of action and had reached the conclusion that the only issue that might profitably be pursued concerned the "fairness" of the existing plan. In attempting to evaluate the substantiality of this claim, however, one is met at the outset by the fact that plaintiffs or their attorneys have not further delineated the nature of the alleged "unfairness" purportedly found by them in the present plan.

Let us examine the present incentive compensation plan, plaintiffs' claims with respect thereto which might reasonably raise an issue as to "fairness", and the proposed modification of such plan.

Under the existing (1956) formula, incentive compensation awards may be made only for those years when consolidated net earnings of the corporation and consolidated subsidiaries (as reported in the annual report to the stockholders) *before* taxes on income and

before provision for incentive compensation and interest on long-term debt of the corporation, exceed 7% of the shareholders' investment (capital, surplus and retained earnings) in the corporation and consolidated subsidiaries and long-term debt of the corporation. The total provision for awards in any year is limited to 5% of such excess. The 1956 formula does not contain any provision limiting the bonus fund in any year to the amount of dividends declared in such year, or any other dividend limitation.

The only issue as to the "fairness" of this plan which might reasonably be said to have been raised in the Dann complaint and which has not been conceded by the plaintiffs to be without merit is the claim that the present plan is wasteful, because it permits payments to be made in excess of what could be granted under the comparable incentive compensation plans of Chrysler's principal competitors. The Dann complaint asserts that the plan should permit payments only when the income of the corporation exceeds a reasonable return on the stockholders' investment, the present Chrsyler plan requiring a "set aside" only of 7% of the stockholders' investment before taxes, which is the equivalent of about 3½% after taxes. Such payments are said to have been particularly wrongful under the circumstances, because Chrysler's position in the automotive industry has declined since 1956 while the incentive payments to Chrysler employees during that period have nonetheless been substantial. A similar charge was made in the Gallo complaint.

It can be fairly said I think that, generally speaking, both the Dann and Gallo complaints challenge the set-aside percentage in the present plan as "unfair" on the ground that the return on the stockholders' investment is too small in relation to the amount of incentive compensation that can be awarded. In this sense "an issue as to the fairness of the existing plan", as stated by the proponents in the stipulation of settlement, can be said to remain in the case. This disposes of a suggested objection to the settlement that it is not "related" to any of the causes of action. Compare *Manacher v. Reynolds Metals,* 39 *Del.Ch.* 401, 165 *A.2d* 741. I pass over for the time being the problem of evaluating the probability of success on the plaintiffs' part if ultimately they were to litigate this issue.

The proposed plan, as modified in accordance with the terms of the settlement, provides that for the years 1963 through 1969, incentive compensation awards may be made only for those years when the sum of (1) consolidated net earnings of the corporation and consolidated subsidiaries (as reported in the annual report to the stockholders) *after* taxes on income, and (2) provision for incentive compensation, and (3) interest on long-term debt of the corporation, exceeds 5½% of the stockholders' investment (capital, surplus and retained earnings) in the corporation and consolidated subsidiaries and long-term debt of the corporation. The total provision for awards in any year is limited to the lesser of 12% of such excess or the aggregate amount of all dividends declared upon the common stock of the corporation during the year.

The basic changes brought about by the modification have been the conversion of what was previously a before-tax incentive plan into an after-tax plan, an increase[2] in the set-aside (i.e., the return on the stockholders' investment before payment of any incentive compensation under the plan), and an increase[3] in the percentage of compensation to be awarded after deduction of the set-aside.

Thus, the 1963 formula requires a higher level of earnings before any award of incentive compensation may be made, by reason of the higher set-aside. Until the "cross-over point" is reached (i. e., the point at a still higher level of earnings where the amount of the bonus fund would be the same under both formulas), the higher set-aside

2. The 7% stockholders set-aside under the 1956 formula relates to before-tax earnings, whereas the 5½% stockholders set-aside under the 1963 formula relates to after-tax earnings. Consequently, assuming a 50% effective tax rate, on an after-tax basis the 7% set-aside under the 1956 formula would be equivalent to only 3½%, as compared with the 5½% set-aside under the 1963 formula. Conversely, on a before-tax basis, the 5½% set-aside under the 1963 formula would be equivalent to 11%, as compared with 7% under the 1956 formula.

3. The bonus rate of 5% under the 1956 formula relates to before-tax earnings whereas the bonus rate of 12% under the 1963 formula relates to after-tax earnings. Assuming a 50% effective tax rate, on an after-tax basis, the 5% bonus rate under the 1956 formula would be equivalent to 10%, as compared with the 12% bonus rate under the 1963 formula. Conversely, on a before-tax basis, the 12% bonus rate under the 1963 formula would be equivalent to 6% as compared with 5% under the 1956 formula.

under the 1963 formula would more than offset the higher rate of bonus so that a smaller bonus fund would be created under the new formula than under the 1956 formula. But once the level of earnings rises above the cross-over point a larger bonus fund will result under the 1963 formula than under the 1956 formula. However, under the 1963 formula, as a result of the increase in retained earnings, the set-aside in each succeeding year becomes greater than it would have been under the 1956 formula thereby requiring an even better earnings performance in each of these years to obtain the same bonus fund.[4]

To a certain extent then plaintiffs can fairly claim that they have achieved at least one of the objectives of their suit which was to increase the set aside and thereby increase the amount of income which must be earned by the corporation before equivalent amounts of incentive compensation can be paid. That is not to say of course that plaintiffs' claim as to "unfairness" in the present plan is well founded. Indeed, considering the facts of record now before the court, I think the probability was small that ultimate success could have been achieved on this issue. Because of this, however, the plaintiffs, defendants, and objectors have taken radically different approaches in attempting to sustain or attack the validity of the proposed settlement.

The plaintiffs vigorously urge that the proposed modification plus the changes in management, etc., which were mentioned before, are "beneficial" to Chrysler and accomplish the objectives of the lawsuit. Thus, the plaintiffs have attempted to formulate the settlement within the traditional framework of a quid pro quo offered by the defendants in exchange for releases from further liability.

The defendants, including Chrysler, ignore the traditional approach. They deny there is merit to any of the claims, and while they believe that the modified plan will be advantageous to Chrysler and its stockholders, they do not believe that it remedies any supposed defect in the old plan. They agree that apart from the settlement, Chrysler's management had not previously given any consideration to a modification of the existing bonus plan.

---

4. The amicus computed that for the ten-year period 1953 through 1962, the total bonus fund would have been $3,748,713 less than it was, had the 1963 formula been applied.

The defendants urge that regardless of the extent to which the modification can be said to "benefit" Chrysler, the court should approve the settlement as fair and reasonable, since the expense of continuing the litigations will far outstrip any potential recovery.

The objectors, except Ezzes[5], agree with the defendants that all the claims are without merit and should be disposed of. They disagree, however, that the lawsuit may properly be settled on the basis proposed by the plaintiffs and defendants. The objectors' contentions are basically reducible to two propositions. First, it is said, the proposed modification offers no demonstrable benefit of any kind to Chrysler though, if approved, it will commit Chrysler to a substantial change in its compensation plan. Secondly, as a practical matter, approval of the modification by the court will create for Chrysler's employees, a number of whom are defendants herein, a larger fund for the year 1963 than would be available under the existing plan. The objectors say that reasonably viewed, the defendants must have been aware of such fact when they agreed to the settlement.

The objectors suggest that plaintiffs' attorneys supported the proposed modification as part of the settlement not because it would remedy some arguable defect in the existing compensation plan, but because it would give color to their claim for an allowance of attorneys' fees. The defendants were willing to accept these terms, it is said, because they were required to surrender nothing in return for their releases. Moreover, since Chrysler's earnings for the fiscal year ending in 1963 promise to exceed the "cross-over point," the bonus fund will be larger than if the 1956 formula were still in effect. For all these reasons the objectors urge that the proposed settlement be rejected as unfair and unreasonable.

Having considered the nature of the claims and the possible defenses, I agree with the basic position of the defendants and objectors that there is little, if anything, to the causes of action asserted by the plaintiffs. Obviously in such a case settlement of the litigation is in

5. The Ezzes objections are considered above and have been rejected by the court. Ezzes, however, also joins in the objections here stated, viz., that the proposed modification is not a proper or adequate consideration for settling the lawsuit.

the best interest of the corporation and in fact is much to be desired from the point of view of all the interested parties. The problem I am confronted with here, however, with due regard for the court's obligation to exercise its judgment with respect to the fairness of the settlement, lies in determining what terms may properly be accepted by the court.

Common sense it seems to me would dictate that where the hope of recovery on the part of the plaintiffs, and thus on the part of the corporation, is small, little can be demanded from the defendants by way of settlement. Certainly this is the case here.

The objectors say, however, that no settlement can be approved unless there is technical legal merit to the claims asserted in the complaint and consideration of some formal nature is offered by the defendants in exchange for their releases. Thus, they urge that if the complaints lack legal merit, they should be dismissed with prejudice. They should not be permitted to become the basis for a supposed settlement wherein the defendants offer nothing because the claims asserted against them have virtually no value.

Assuming without deciding that the rule urged by the objectors might be applicable in a case where the court could say with complete confidence that the claims lack "technical legal merit", nonetheless it is clear that this is not such a case. There is no doubt that in the technical sense many of the asserted claims would survive a motion to dismiss, assuming the defendants chose to press such a notion. Thus, if the court were to reject the proposed settlement, the parties would merely be in the position of having to continue the litigation. It is just this situation which, with some justification on either side, both plaintiffs and defendants have to avoid. Under the circumstances, I think that the court need only determine whether the terms are fair when measured against the probability of recovery on the asserted claims.

The objectors next contend, however, for a wide variety of reasons, that the court ought not accept a modification of the incentive compensation plan as the basis for settlement. First, apart from the fact that the modified plan is likely to give the individual defendants a greater return than the old plan for the year 1963, the objectors

contend that the proposed plan cannot be shown to be an improvement over the old plan and therefore is not a "valuable consideration" offered by the defendants for settlement. The basis for this contention is that no one can adequately foresee what the future holds for Chrysler in the way of profits. The objectors purport to show that it is probable that Chrysler will operate in the future at or above the cross-over point and therefore that the payments to Chrysler employees will probably exceed what they would have been under the old plan. This conclusion, however, rests on the selective use of available financial data with which in my opinion one may either agree or disagree. The objectors say, however, that in any case the modification must be rejected because the proponents have the burden of showing that the modification will result in smaller incentive payments or otherwise provide some demonstrable benefit to the corporation and this they cannot do.

It is fair to say I think that no one can predict with certainty what degree of success Chrysler will have in its operations in future years. Although Chrysler enjoyed a series of profitable years from 1950 to 1957, it showed a loss in 1958 and 1959. No one will deny, moreover, that the earnings of a major business corporation engaged in the production of automobiles are subject to a number of variables, some of which have little, if any, relationship to the amount of effort exerted by management. To that extent of course the objectors are justified in asserting that the proponents cannot "prove" that incentive payments will be smaller in any particular year in the future. All that may be said in the final analysis is that under the proposed modification earnings will have to be higher, up to the cross-over point, in order for payments to be the same as they would have been under the old plan but once that point is exceeded, payments can be larger.

Does the fact that there is no assurance that the fund and thus the probable payments in any particular year will be smaller under the proposed formula than under the existing formula vitiate the modification of the incentive compensation plan as the basis for settlement? Clearly there are dangers involved in this type of settlement where the only "consideration" offered by the defendants is the taking of some corporate action which not only involves no immediate detriment

to the "charged" defendants or "assured" benefit to the corporation but also may in fact ultimately result in larger compensation payments to the defendants, among others. That is only to say, however, that each such case must be considered on its own merits. The objection made is not so much that the defendants are not giving a sufficient "consideration" but that they are purporting to give a consideration when in fact they are giving no consideration at all. The objectors state that they would prefer the actions to be dismissed rather than settled on the proposed basis. Since a refusal to approve the settlement cannot be equated with a dismissal of the actions, the objection here seems clearly to be related to plaintiffs' claims for an allowance of attorneys' fees rather than opposition to the termination of the pending litigations.

I am satisfied that as a practical matter settlement on the basis of the proposed modification is fair and reasonable subject to the limitation hereinafter imposed. Rejection of the settlement generally would clearly not be in the interest of Chrysler or its stockholders. While, as I have indicated before, there can be substantial disagreement as to whether the proposed change in the incentive compensation plan is an "improvement", there is no substantial showing that it will be detrimental to Chrysler. To the extent that this issue may be said to be poised in the balance, I think that the overwhelming approval of the modification by Chrysler stockholders with the knowledge that they were in effect approving the settlement constitutes a "plus" for the approval of the settlement.

Because much is made of it, I next consider the additional contention of the Dann plaintiffs that the "change" in Chrysler's management which has presumably occurred is itself sufficient consideration for settlement of the lawsuits. The Dann plaintiffs charged in their complaint that certain directors, officers, and employees of Chrysler were guilty of gross mismanagement, and they sought, inter alia, the appointment of a receiver for Chrysler. The Dann plaintiffs contend that a major objective of this litigation has been to effect a change in Chrysler's management. They claim that the present lawsuit coupled with Dann's earlier activities is substantially responsible for such change or changes as have occurred in Chrysler's management.

Assuming without deciding that Dann's activities both before and after the filing of the complaint produced what he now describes as a "change in management", how, one asks, does that fact bear on the issue as to the fairness of the proposed settlement?

The defendants deny that any changes or improvements in Chrysler which may have occurred since the commencement of the plaintiffs' activities are attributable to the plaintiffs. It is certain, in any event, that the so-called change of management is not a "benefit" tendered to Chrysler by the defendants as a term of the settlement.

As I view the matter, it makes little difference on the issue as to the fairness of the settlement whether plantiffs are credited with the presumed change in management or whether such changes are in fact beneficial to Chrysler. The paramount factor, as was noted before at some length, is that Chrysler and its stockholders have little to gain from a continuation of these litigations. Even if I were to conclude that these changes of personnel are not attributable to the plaintiffs, it could hardly be urged that the court should therefore withhold its approval of the settlement.

The objectors offer certain other reasons why the settlement on the proposed basis should be rejected. First, they say that modification of the incentive compensation plan could have been undertaken by the directors and stockholders apart from settlement if the modification were thought worthwhile. This is of course true, but it does not follow that the old plan was improper. Indeed, the record would support a contrary conclusion. This being so the new plan and tender thereof as a basis for settlement cannot be evaluated as merely the result of their having performed their duty.

The objectors next say, however, that stockholder approval should be disregarded here because the stockholders may have felt that the modified plan should be adopted not because it is meritorious in and of itself, but because it was in the interest of the corporation to terminate the litigations. Assuming that the psychological motivation of the stockholders was as the objectors suggest, nonetheless I do not think their objection is of decisive significance. After all, the most ·that may be said is that the stockholders were called upon to make a

business judgment weighing the desirability of continuing the litigations against the supposed merits of the modified plan. Their approval is at least some evidence that the terms of the proposed settlement are fair. To this may be added the fact that the raising of the so-called cross-over point should certainly in the long run result in an increase in the stockholders' equity.

Finally a point is made that the tendered plan is incompatible with the legal principle found in *Nadler v. Bethlehem Steel Corp.*, 38 *Del.Ch.* 427, 154 *A.2d* 146, and *Duane v. Menzies*, 37 *Del.Ch.* 416, 144 *A.2d* 229 to the effect that the tendered terms of settlement must be sufficiently definite and beneficial to be capable of present valuation at least in a comparative sense. First of all, the approval of this settlement will not constitute a judicial imprimatur of its future operation. Indeed, the court in the Nadler case later approved a settlement after it was made clear that its future operation was not being approved. While it is true that there is no assurance that during the "term" of this plan there will be a monetary "saving" to the corporation, the fact is that business-wise it should benefit the corporation. Therefore, considering its inherent limitations and the limited qualifications hereinafter imposed, I do not believe that the Plan runs afoul of either the Nadler or the Menzies cases.

I therefore conclude that in the application of the governing standards this settlement should be approved with one qualification. It is clear that the directors "bargained" for this settlement in the context of a profit picture for Chrysler that practically assured the directors that the "new" plan would produce a substantially greater fund than would the old plan for 1963. Thus, even with due allowance for the fact that the future operation under the plan is an "unknown", I do not believe that it is appropriate for the director defendants who are beneficiaries under the plan to receive the fruits of the new plan for 1963. I will therefore approve the terms of settlement on the condition that the director defendants who are beneficiaries under the plan agree that as to the year 1963 they will derive no added financial reward solely as a result of the modification. If they so agree I will expect counsel to suggest mechanics by which such a result can be.

achieved. If counsel cannot agree they may submit suggested alternatives by a fixed date.

One further matter of substance requires attention. Under a separate arrangement Chrysler has agreed, if the present settlement is approved, to pay a $20,000 fee to Dann's attorney in the libel action in the Superior Court. The Sandler objectors say that this payment is an "improper preference" to Dann over other stockholders and therefore should be disapproved by the court.

The testimony disclosed that at least some of the $20,000 payment is justified by Chrysler on the basis that it represents, in part, payment for legal services rendered the Dann plaintiffs in this litigation by the attorney involved. The balance is presumably justified on the basis of a business-judgment settlement by Chrysler of the libel action which was complicated for Chrysler by a contemplated counterclaim by Dann for damages based on alleged abuse of process.

Preliminarily, the court is not asked to "approve" the $20,000 payment. Thus, contrary to the request of the Sandler objectors, it cannot "disapprove" the payment as such. As a practical matter, all the court can do at this stage is disapprove the entire settlement on the ground that the intended payment renders the entire settlement unfair. I note, however, that the Sandler objectors do not urge that the settlement be disapproved on this score. They merely ask that the court not permit this payment.

In discharging my duty here, I have considered this dubious fee arrangement a negative factor in arriving at my judgment concerning the fairness of the terms of settlement. However, I do not consider it a sufficient basis for refusing such approval. If I felt that the payment were a sham or device to provide an out of court "pay-off" to obtain a settlement which ignored the interest of the stockholders generally, I would not hesitate to withhold approval of the settlement. The record, however, does not warrant such a conclusion. Moreover, the Gallo plaintiffs and their attorneys, who helped negotiate this settlemen, did not participate in any of the negotiations surrounding the disposition of the libel action. Thus, I do not think the fairness of the

settlement herein is in fact impugned by the agreement to pay a fee to Dann's separate counsel.

However, I think it apparent that the payment of the $20,000 fee is, euphemistically speaking, intimately connected with the settlement of the derivative actions. Thus, to the extent that any of the intended fee represents payment for services allegedly rendered in connection with these actions, the effect of the arrangement would be to circumvent the powers generally exercised by this court in supervising such payments.

Thus, while the settlement itself ought not be disapproved as "unfair" because of the proposed payment, I am of the opinion that disposition of this fee matter should await the hearing on the question of plaintiffs' fees generally. Perhaps Dann and Chrysler will agree that payment of the stipulated sum or any part thereof will abide a decision by this court as to its propriety when judged by controlling Chancery standards. If not, then the matter will be considered in determining whether and to what extent Dann is entitled to reimbursement for counsel fees herein.

Other assorted matters not herein mentioned have been considered. They have been determined either to be consistent with the conclusions herein reached or irrelevant thereto.

Present order on notice.

## On Motions for Reargument

Motions for reargument have been filed by the Ezzes, Koenigsberg, and Sandler objectors. They say the settlement should be approved only on the condition that the new incentive compensation plan take effect as to all beneficiaries on January 1, 1964 rather than January 1, 1963, as provided in the proposed settlement. The basis for their contention is found in this court's prior opinion. There the court said that the settlement would be approved on the condition that the director defendants who are beneficiaries under the plan agree that as to 1963 they will receive no additional financial reward solely as a result of the modification. This was done because it was found "that the directors 'bargained' for this settlement in the context of a profit pic-

ture for Chrysler that practically assured the directors that the 'new' plan would produce a substantially greater fund than would the old plan for 1963".

The objectors in effect say that there is no reason why any beneficiaries of the plan, not merely the director defendants, should benefit in 1963 when the financial picture for that year was as indicated, particularly since the new plan was tendered as a settlement device. In their answer to the objectors' motion, certain defendants say that the court erred in finding that the directors bargained for this settlement in the context above quoted. Thus, they say the condition was imposed on the basis of an erroneous premise and it would therefore be compounding the error to extend the condition to all the beneficiaries of the plan. They say that only one director participated in the negotiations and that he largely settled the terms as early as February 1962.

The problem under consideration must be evaluated in the light of the function the court was called upon to perform, viz., to pass upon the fairness of the settlement. Parenthetically, when the court was writing the original opinion, it considered the possibility of imposing the condition now suggested by the objectors.

Because the changed incentive compensation plan, rather than any "consideration" flowing from the real defendants, was tendered as the basis for the settlement, the court felt compelled to evaluate carefully the result of the change particularly insofar as the director defendants were concerned. It was reasonably clear to me from the record that there had been general public acceptance of Chrysler's cars for the model year 1963. This was evident not only from the earnings picture for the last quarter of 1962 but from the figures for most of the first quarter of 1963. These matters plus the general financial prospects for Chrysler were of course known when Chrysler agreed to the settlement in final form in late February 1963 and again when the board confirmed the settlement in late March 1963. The knowledge and expectations of the defendant directors concerning Chrysler obviously put them in the position where they at least for the year 1963 could obtain a complete release from the litigation not only without paying anything personally but by finally approving a revised plan

which would probably assure them even greater compensation payments for 1963.

In my prior opinion I used "bargained" in relation to the time the matter ripened for judicial consideration. Perhaps "bargained" was an unhappy choice of language. It might have been better to say "finalized." In any event the settlement cannot be justified by the directors by refusing to consider what the true situation was when the matter was finally ripe for submission to the court. They had a continuing duty to the stockholders to agree only to what was then fair.

I also note that the defendants' answer to the motion emphasizes that the new plan was negotiated by one director and that the director defendants subject to the condition constitute a minority of the entire board of directors. From these facts they seem to be suggesting that the imposition of the condition is either unfair or is based on actions which were not under their control. I need not consider the legal niceties of this problem in the context of mere adversary proceedings. As noted, the directors approved a settlement in the light of a profit picture which resulted in benefits to certain members of the board. Minority or not, the result was reasonably certain to provide some of its members who were defendants with a benefit at least for 1963 which was greater than they would have received had the lawsuits been litigated and decided in their favor. In the face of the total picture presented, particularly in view of defendants' evaluation of the merits of the lawsuits, this was a benefit which I felt in fairness should be removed.

Thus, the court does not feel that the premise in the prior opinion for imposing the condition upon the director defendants is unwarranted. Nevertheless, this does not aid the objectors here because the nondirector beneficiaries of the plan were not personally involved in approving the change and making it applicable to 1963. Also, not being defendants, they were not receiving any benefit for the release of corporate causes of action against them. Moreover, in the long view of this plan one cannot say with objective assurance whether it will or will not be more beneficial to the participants. Indeed, it may be less so. Thus, the court adheres to the limited condition imposed in the prior opinion.

The Sandler objectors also argue that the court should adopt the January 1, 1964 date generally, because it now knows the effect of the new plan for the year 1963. Passing over the element of hindsight, I believe this point overlooks the fact, noted above, that we are dealing with a seven year plan. The fairness test cannot be applied by looking at the results of only one year. The imposition of the condition on the defendant directors was imposed for reasons special to them.

Other grounds for reargument either are adequately treated in the prior opinion or do not call for any change therein. Thus, the motions for reargument are denied.

Present order on notice.