**In re WHEELABRATOR TECHNOL-
OGIES, INC. SHAREHOLDERS
LITIGATION.**

Civ. A. No. 11495.

Court of Chancery of Delaware,
New Castle County.

Submitted: March 3, 1995.

Decided: May 16, 1995.

Revised: May 18, 1995.

---

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, Wilmington; Pamela S. Tikellis and Carolyn D. Mack, of Chimicles, Jacobsen & Tikellis, Wilmington; Steven G. Schulman, of Milberg, Weiss, Bershad, Hynes & Lerach; Abbey & Ellis, New York City, for plaintiffs.

Henry E. Gallagher, Jr. and John C. Kairis, of Connolly, Bove, Lodge, & Hutz, Wilmington, for defendant Waste Management, Inc.

David C. McBride, of Young, Conaway, Stargatt & Taylor, Wilmington, for defendants Wheelabrator Technologies, Inc. and the individual defendants.

*OPINION*

JACOBS, Vice Chancellor.

This shareholder class action challenges the September 7, 1990 merger (the "merger") of Wheelabrator Technologies, Inc.

("WTI") into a wholly-owned subsidiary of Waste Management, Inc. ("Waste"). The plaintiffs are shareholders of WTI. The named defendants are WTI and the eleven members of WTI's board of directors at the time the merger was negotiated and approved.[1]

The plaintiffs claim that WTI and the director defendants breached their fiduciary obligation to disclose to the class material information concerning the merger. The plaintiffs also claim that in negotiating and approving the merger, the director defendants breached their fiduciary duties of loyalty and care. The defendants deny that they breached any duty of disclosure. They further contend that because the merger was approved by a fully informed shareholder vote, that vote operates as a complete defense to, and extinguishes, the plaintiffs' fiduciary claims.

This is the Opinion of the Court on the defendants' motion for summary judgment. For the reasons elaborated below, the Court concludes that: (1) the plaintiffs have failed to adduce evidence sufficient to defeat summary judgment on their duty of disclosure claim, and that (2) the fully informed shareholder vote approving the merger operated to extinguish the plaintiffs' duty of care claims, but not their duty of loyalty claim. Accordingly, the defendants' summary judgment motion is granted in part and denied in part.

## I.  *PROCEDURAL BACKGROUND*

On April 5, 1990, the plaintiffs commenced these class actions (which were later consolidated) challenging the then-proposed merger with Waste. After expedited discovery, the plaintiffs moved for a preliminary injunction. That motion was denied, *In re Wheelabrator Technologies, Inc. Shareholders Litig.,* Del. Ch., Cons.C.A. No. 11495, Jacobs, V.C., 1990 WL 131351 (Sept. 6, 1990) (*"Wheelabrator I "*), and the merger was approved by WTI's

shareholders, specifically, by a majority of WTI's shareholders other than Waste.

On July 22, 1991, the plaintiffs filed a Second Amended Consolidated Class Action Complaint, which the defendants moved to dismiss pursuant to Chancery Court Rule 12(b)(6). That motion was denied in part and granted in part. *In re Wheelabrator Technologies, Inc. Shareholders Litig.,* Del.Ch., Cons.C.A. No. 11495, Jacobs, V.C., 1992 WL 212595 (Sept. 1, 1992). As a result of that ruling, all but three claims alleged in the complaint were dismissed.

The first remaining claim is Count I of the complaint, which alleges that the defendants violated their duty to disclose all material facts related to the merger in the proxy statement issued in connection with the transaction. More specifically, plaintiffs allege that (i) the proxy statement falsely represented that the merger negotiations lasted one week, whereas in fact agreement on all essential merger terms had been reached on the first day; (ii) the proxy statement disclosed that WTI's negotiators had successfully extracted concessions from Waste, whereas in fact Waste had dictated the merger terms to WTI; and (iii) the proxy statement disclosed that WTI's board had carefully considered the merger agreement before approving and recommending it to shareholders, whereas in fact the board did not consider the matter carefully before it acted.

Count III alleges that the defendants breached their duty of care by failing adequately to investigate alternative transactions, neglecting to consider certain nonpublic information regarding certain of Waste's potential legal liabilities, failing to appoint a committee of independent directors to negotiate the merger, and failing adequately to consider the merger terms.

Count IV alleges that the defendants breached their duty of loyalty, in that a majority of WTI's eleven directors had a conflict of interest that caused them not to

---

1.  Three of the eleven individual director defendants, Paul M. Montrone, Rodney C. Gilbert, and Paul M. Meister, were all members of WTI's management. Four directors, Dean L. Buntrock, William P. Hulligan, Phillip B. Rooney, and Don-

ald F. Flynn were officers of Waste Management. The remaining four directors, Michael D. Dingman, Gerald J. Lewis, Thomas P. Stafford, and Edward Montgomery, were outside directors.

seek or obtain the best possible value for the company's shareholders in the merger.

On December 30, 1992, the defendants filed the pending summary judgment motion seeking dismissal of these claims. Following discovery and briefing, that motion was argued on March 3, 1995.

## II. *RELEVANT FACTS*

WTI, a publicly held Delaware corporation headquartered in New Hampshire, is engaged in the business of developing and providing refuse-to-energy services. Waste, a Delaware corporation with principal offices in Illinois, provides waste management services to national and international commercial, industrial, and municipal customers.

In August 1988, Waste and WTI entered into a transaction (the "1988 transaction") to take advantage of their complementary business operations. In the 1988 transaction, Waste acquired a 22% equity interest in WTI in exchange for certain assets that Waste sold to WTI. The two companies also entered into other agreements that concerned WTI's rights to ash disposal, the purchase of real estate for future refuse-to-energy facilities, and other business development opportunities. As a result of the 1988 transaction, Waste became WTI's largest (22%) stockholder and was entitled to nominate four of WTI's eleven directors.

Over the next two years, Waste and WTI periodically discussed other ways to reduce perceived inefficiencies by coordinating their operations. Those discussions intensified in December 1989, when Waste acquired a refuse-to-energy facility in West Germany. That acquisition raised concerns that the four Waste designees to WTI's board of directors might have future conflicts of interest if WTI later decided to enter the West German market.

Prompted by these and other concerns, Waste began, in December 1989, to consider

either acquiring a majority equity interest in WTI or, alternatively, divesting all of its WTI stock. After several discussions, both companies agreed that Waste would increase its equity position in WTI. On March 22, 1990, Waste proposed a stock-for-stock, market-to-market (*i.e.* no premium) exchange in which Waste would become WTI's majority stockholder. WTI declined that proposal, and insisted on a transaction in which its shareholders would receive a premium above the current market price of their shares.

The following day, March 23, 1990, representatives of WTI and Waste met in New York City. Accompanying WTI's representatives were members of WTI's investment banking firm, Lazard Fréres. At that meeting, Waste's representatives expressed Waste's interest in acquiring an additional 33% of WTI, thereby making Waste the owner of 55% of WTI's outstanding shares. The parties ultimately agreed on that concept. They also agreed to structure the transaction as a stock-for-stock merger that would be conditioned upon the approval of a majority of WTI's disinterested stockholders, *i.e.*, a majority of WTI's stockholders other than Waste. Waste agreed to pay a 10% premium for the additional shares required to reach the 55% equity ownership level. Finally, it was agreed that the merger would involve no "lockup," breakup fees, or other arrangements that would impede WTI from considering alternative transactions.

During the following week, additional face-to-face meetings and telephone conversations took place between the two companies' representatives. Those negotiations resulted in five "ancillary agreements" that gave WTI certain funding and business opportunity options, as well as licenses to use certain Waste-owned intellectual property.[2]

On March 30, 1990, agreement on the final merger exchange ratio was reached. The parties agreed that WTI shareholders would receive 0.574 shares of WTI stock plus 0.469

---

**2.** The ancillary agreements included: (1) $50 million in funding to construct additional WTI refuse-to-energy facilities, (2) an option for WTI to purchase a 15% interest in Waste's international subsidiary at a 15% discount from the market price, (3) an option for WTI to acquire 100% of Waste's medical waste disposal business

at a 15% discount from the market price, (4) licenses to WTI for various intellectual property owned by Waste, and (5) a "Master Intercorporate Agreement" providing WTI with options on services ranging from the presentation of corporate opportunities to cash management and insurance support.

shares of Waste stock for each of their pre-merger WTI shares.

That same day, March 30, 1990, WTI's board of directors held a special meeting to consider the merger agreement. All board members attended except the four Waste designees, who had recused themselves. Also present were WTI's "in-house" and outside counsel, and representatives of Lazard Fréres and Solomon Brothers. The WTI board members reviewed copies of the draft merger agreement and materials furnished by the investment bankers concerning the financial aspects of the transaction. The directors also heard presentations from the investment bankers and from legal counsel, who opined that the transaction was fair. A question and answer session followed.

The seven board members present then voted unanimously to approve the merger and to recommend its approval by WTI's shareholders. After that vote, the four Waste-designated board members joined the meeting, and the full board then voted unanimously to approve and recommend the merger.

On July 30, 1990, WTI and Waste disseminated a joint proxy statement to WTI shareholders, disclosing the recommendation of both boards of directors that their shareholders approve the transaction. At a special shareholders meeting held on September 7, 1990, the merger was approved by a majority of WTI shareholders other than Waste.

### III. THE PARTIES' CONTENTIONS

The defendants seek the dismissal of plaintiffs' remaining disclosure claim on the ground that it has no evidentiary support. The defendants further contend that the effect of the fully informed shareholder vote approving the merger was to ratify the directors' actions in negotiating and approving the merger, and thereby extinguish the plaintiffs' claims that those actions constituted breaches of fiduciary duty.

The plaintiffs respond that they have raised genuine issues of material fact that

preclude the grant of summary judgment on their disclosure claim. They further argue that even if the disclosure claim were dismissed, that would not result in the extinguishment of their breach of loyalty claim.[3] Plaintiffs maintain that the only effect of shareholder ratification would be to impose upon them the burden of proving that the merger was unfair to the corporation, with entire fairness being the applicable standard of judicial review.

On a motion for summary judgment, the facts will be viewed in the light most favorable to the nonmoving party. *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990). Summary judgment will be granted where there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Chancery Court Rule 56(c). The purpose of summary judgment is to avoid a trial that would be useless because of the absence of any genuine issue of material fact. *H. & S. Mfg. Co. v. Benjamin F. Rich Co.,* Del.Ch., 164 A.2d 447, 448 (1960).

I now turn to the defendants' challenges to the plaintiffs' claims.

### IV. THE DISCLOSURE CLAIM

■ Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 85 (1992) (citing *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944–45 (1985)). The plaintiffs argue that the defendants breached their duty of disclosure because the proxy statement issued in connection with the merger was materially misleading in several respects. I find that the plaintiffs have failed to adduce record evidence sufficient to defeat summary judgment dismissing their claims.

The plaintiffs first argue that the record contains evidence that the price and structure of the merger were agreed to on March 23, 1990, the first day of negotiations, and

---

**3.** The plaintiffs do not dispute that if the shareholder vote was fully informed, that would oper-

ate to extinguish their duty of care claim.

that all that remained to be resolved thereafter were "details." That fact, plaintiffs argue, is inconsistent with the proxy statement's portrayal of the merger negotiation process as having lasted a full week, and therefore creates a triable issue of fact.

■ The short answer is that the proxy disclosures are fully consistent with the record facts. Not only does the plaintiffs' brief fail to identify any specific disclosure in the proxy statement that is contradicted by record evidence, but also the plaintiffs' characterization of the record is inaccurate. Plaintiffs claim that all post-March 23, 1990 negotiations concerned only "details" of the merger, but there is undisputed evidence that the final exchange ratio—a critical term in any stock-for-stock merger—was not agreed to until March 30, 1990, the final day of negotiations. Moreover, the ancillary agreements— also a material part of the consideration received by WTI shareholders—were negotiated during the week *after* March 23. (*See* Meister Dep. at 104–111; Koenig Dep. at 115; Golub Dep. at 102–113; Montrone Dep. at 89). Those two highly important terms cannot be downplayed as mere "details." Thus the plaintiffs' first disclosure claim lacks any factual foundation.

The plaintiffs next claim that certain proxy statement language "implied" that WTI's negotiators were successful in extracting significant concessions from Waste, whereas in fact the key merger agreement terms were actually dictated by Waste. That argument must also fail, because the relevant proxy statement disclosures are entirely accurate.

On their face neither the proxy disclosures nor the facts upon which the plaintiffs rely support the claim that Waste dictated the terms of the merger. Indeed, that claim is contradicted by the record. The uncontroverted testimony of Mr. Meister, a WTI officer and director, was that long before the merger was proposed, WTI's senior management had been exploring ways to better coordinate WTI's relationship with Waste. (Meister Dep. at 49–62). It is undisputed that Waste first proposed a transaction that would have offered no premium above the market price of WTI's stock. WTI's representatives turned that proposal down, insisting instead on a merger that included an above-the-market premium. (Montrone Dep. at 24–26, 61–62, 118–119; Rooney Dep. at 62–65, 84–85). Thus, the record clearly demonstrates that the final merger terms were significantly more favorable to WTI's shareholders than was Waste's opening offer. That would not have occurred if (as plaintiffs argue) Waste had dictated the terms of the merger.

Finally, the plaintiffs contend that the proxy disclosure that the WTI Board had "carefully considered the financial, business and tax aspects" of the merger was materially misleading. In fact, plaintiffs argue, the WTI board had deliberated for only three hours before voting to approve and recommend the merger to WTI shareholders.

This argument also lacks evidentiary support. The assertion that the WTI board could not have considered the merger proposal carefully rests upon an unsupported inference from one fact: the three hour length of the March 30, 1990 board meeting. Given the other undisputed facts of record, that inference is unreasonable and does not create a triable fact issue. First, the board meeting was attended by WTI's investment bankers and outside counsel who made presentations and thereafter answered the board members' questions. Second, the proxy statement describes in detail the various factors that the board considered in deciding whether to approve and recommend the merger. (*See* Proxy Statement at 31–32). The plaintiffs offer no evidence that that description was in any way inaccurate. Third, Waste and WTI had had a close business relationship for over two years before the merger, during which time many discussions concerning the future of that relationship had taken place. It is reasonable to (and I do) infer that WTI's directors already had, and were able to draw upon, a substantial working knowledge of Waste during the March 30, 1990 meeting.

\* \* \*

■ In short, the defendants have adduced evidence that clearly supports all three challenged proxy disclosures. That shifted to the plaintiffs the burden of establishing

the existence of material fact issues in order to defeat summary judgment. *See Tanzer v. Int'l Gen. Indus., Inc.,* Del.Ch., 402 A.2d 382, 385 (1979) (holding that where a "movant puts in the record facts which, if undenied, entitle him to summary judgment, the burden shifts to the defending party"). The plaintiffs failed to carry that burden. Rather than adduce specific facts supportive of their claim, they offer only unsupported allegations and inferences. That is insufficient to defeat summary judgment. *See* Chancery Court Rule 56(e).

For the foregoing reasons, summary judgment will be granted dismissing the remaining duty of disclosure claim.

## V. *THE FIDUCIARY DUTY CLAIMS*

In rejecting the disclosure claim, the Court necessarily has determined that the merger was approved by a fully informed vote of a majority of WTI's disinterested stockholders. That determination requires the Court to confront the defendants' argument that that vote constituted shareholder ratification which operated as a complete defense to, and consequently extinguished, the claims that the defendants breached their fiduciary duties of care and loyalty.

The plaintiffs do not dispute that if the WTI shareholder vote was fully informed, it operated to extinguish their due care claim in this case. They avidly insist, however, that that vote could not, as a legal matter, extinguish their duty of loyalty claim. Plaintiffs argue that because the merger was an "interested" transaction subject to the entire fairness standard of review, the sole effect of shareholder ratification was to shift to plaintiffs the burden of proving that the merger was unfair.

■ I conclude, for the reasons next discussed, that (1) the effect of the informed shareholder vote was to extinguish the plaintiffs' due care claim; (2) that vote did not operate either to extinguish the duty of loyalty claim (as defendants contend), or to shift to the plaintiffs the burden of proving that the merger was unfair (as plaintiffs contend); and (3) the effect of the shareholder vote in this case is to invoke the business judgment

standard, which limits review to issues of gift or waste with the burden of proof resting upon the plaintiffs. Because the parties have not yet been heard on the question of how the business judgment standard would apply to these facts, summary judgment with respect to the duty of loyalty claim must be denied.

### A. *The Duty of Care Claim.*

As noted, the plaintiffs concede that if the WTI shareholder vote was fully informed, the effect of that informed vote would be to extinguish the claim that the WTI board failed to exercise due care in negotiating and approving the merger. Given the ratification holding of *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 889–90 (1985), that concession is not surprising. In *Van Gorkom,* the defendant directors argued that the shareholder vote approving a challenged merger agreement "had the legal effect of curing any failure of the board to reach an informed business judgment in its approval of the merger." *Id.* at 889. Accepting that legal principle (but not its application to the facts before it), the Supreme Court stated:

> The parties tacitly agree that a discovered failure of the Board to reach an informed business judgment constitutes a voidable, rather than a void, act. Hence, the merger can be sustained, notwithstanding the infirmity of the Board's actions, if its approval by majority vote of the shareholders is found to have been based on an informed electorate.

*Id.* at 889.

■ Accordingly, summary judgment dismissing the plaintiffs' due care claim will be granted. That leaves for decision the legal effect of the informed shareholder vote on the duty of loyalty claims alleged in Count IV of the complaint.

### B. *The Duty of Loyalty Claim.*

The defendants contend that the informed shareholder approval of the WTI–Waste merger also operated to extinguish the claim that the directors' approval of the merger violated their duty of loyalty to WTI and its stockholders. The plaintiffs counter that a fully informed shareholder vote cannot, as a

matter of law, operate to extinguish a duty of loyalty claim. At most, plaintiffs argue, the informed shareholder vote in this case would only shift to the plaintiff the burden of showing that the merger was unfair. Having considered the relevant authorities, and the law on this subject generally, I conclude that neither side's position is correct.

### 1.

I begin with the candid observation that the defendants' "claim extinguishment" argument is squarely supported by two decisions of this Court, one handed down in this very case. *Wheelabrator I, supra,* Mem.Op. at 19–20; *Weiss v. Rockwell, Int'l. Corp.,* Del. Ch., C.A. No. 8811, Jacobs, V.C. (July 19, 1989), *aff'd per curiam,* Del.Supr., 574 A.2d 264 (1990).

In *Weiss,* this Court dismissed a fiduciary duty of loyalty claim that the directors of Rockwell International had approved a charter amendment creating a new class of supervoting stock for the sole purpose of entrenching themselves in office. Citing *Van Gorkom,* this Court held, without extended analysis, that the fully informed shareholder approval of the amendment extinguished the duty of loyalty claim. *Weiss, supra,* Letter Op. at 10. The Supreme Court affirmed that dismissal without comment in a *per curiam* opinion. 574 A.2d 264 (1990). In *Wheelabrator I,* this Court, citing *Van Gorkom* and *Weiss,* denied the plaintiffs' motion for a preliminary injunction against the merger at issue here, on the ground (*inter alia*) that if WTI's shareholders approved the merger, that ratifying vote would extinguish the plaintiffs' so-called *"Revlon"* claim.

In *Weiss* and *Wheelabrator I,* this Court reached that result by extending to a duty of loyalty claim the "extinguishment" doctrine applied to a duty of care claim in *Van Gorkom.* Although this Court did not articulate the propriety of that extension in doctrinal or policy terms, the result it reached was in-

formed by the Supreme Court's statement in *Van Gorkom* that:

> where a majority of fully informed stockholders ratify action *of even interested directors,* an attack on the ratified transaction normally must fail.

488 A.2d at 890 (emphasis added). That language suggested that the Supreme Court would endorse the application of its "claim extinguishment" doctrine to duty of loyalty claims.

Not surprisingly, the defendants here argue that *Weiss* and *Wheelabrator I* impel the Court to reach the same result, that is to conclude that the plaintiffs' duty of loyalty claims were automatically extinguished by virtue of shareholder ratification. My difficulty with the defendants' position is that since 1990 the law has changed, and there is now significant reason to conclude that *Wheelabrator I* and *Weiss* would not be regarded as good law today. Not only has the Delaware Supreme Court never endorsed the view adopted in those cases, the decisions that postdate *Weiss* and *Wheelabrator I* persuasively indicate that the Supreme Court would not hold that shareholder approval of board action claimed to violate the fiduciary duty of loyalty would operate automatically to extinguish a duty of loyalty claim.

### 2.

The question of whether or not shareholder ratification should operate to extinguish a duty of loyalty claim cannot be decided in a vacuum, divorced from the broader issue of what generally are the legal consequences of a fully-informed shareholder approval of a challenged transaction. The Delaware case law addressing that broader topic is not reducible to a single clear rule or unifying principle. Indeed, the law in that area might be thought to lack coherence because the decisions addressing the effect of shareholder "ratification" have fragmented that subject into three distinct compartments, only one of which involves "claim extinguishment."[4]

---

**4.** As used in our case law, even the term "shareholder ratification" has no fixed meaning, as that same term is used to describe three quite different sets of circumstances. In its "classic" or paradigmatic form, shareholder ratification de-

scribes the situation where shareholders approve board action that, legally speaking, could be accomplished without any shareholder approval. Examples are cases involving shareholder ratification of board action approving a stock option

■ The basic structure of stockholder ratification law is, at first glance, deceptively simple. Delaware law distinguishes between acts of directors (or management) that are "void" and acts that are "voidable." As the Supreme Court stated in *Michelson v. Duncan*, 407 A.2d 211, 218–19 (1979):

> The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are *ultra vires*, fraudulent, or waste of corporate assets. The practical distinction, for our purposes, is that voidable acts are susceptible to cure by shareholder approval while void acts are not.

(citations omitted).

One possible reading of *Michelson* is that all "voidable" acts are "susceptible to cure by shareholder approval." Under that reading, shareholder ratification might be thought to constitute a "full defense" (407 A.2d at 219) that would automatically extinguish all claims challenging such acts as a breach of fiduciary duty. Any such reading, however, would be overbroad, because the case law governing

the consequences of ratification does not support that view and, in fact, is far more complex.

The Delaware Supreme Court has found shareholder ratification of "voidable" director conduct to result in claim-extinguishment in only two circumstances. The first is where the directors act in good faith, but exceed the board's *de jure* authority. In that circumstance, *Michelson* holds that "a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors."[5] 407 A.2d at 219. The second circumstance is where the directors fail "to reach an informed business judgment" in approving a transaction. *Van Gorkom*, 488 A.2d at 889.

Except for these two situations, no party has identified any type of board action that the Delaware Supreme Court has deemed "voidable" for claim extinguishment purposes. More specifically, no Supreme Court case has held that shareholder ratification operates automatically to extinguish a duty of loyalty claim. To the contrary, the ratification cases involving duty of loyalty claims have uniformly held that the effect of share-

---

plan, see e.g., *Michelson v. Duncan*, Del.Supr., 407 A.2d 211, 224 (1979), or a loan to or from a director or officer. *See e.g., Marciano v. Nakash*, Del.Supr., 535 A.2d 400 (1987). Thus, "classic" ratification involves the voluntary addition of an independent layer of shareholder approval in circumstances where such approval is not legally required.

But, "shareholder ratification" has also been used to describe the effect of an informed shareholder vote that was statutorily required for the transaction to have legal existence. Examples are mergers, *see, Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701, 703 (1983); *Van Gorkom*, 488 A.2d at 889–890, and amendments to the certificate of incorporation, *e.g., Stroud v. Grace*, 606 A.2d at 83–84 (1992), both of which require shareholder approval to attain juridical existence. *See,* 8 *Del.C.* §§ 242, 251, *et seq.*

Even this second category is divisible into two subcategories: (a) transactions with a controlling stockholder that are expressly conditioned upon obtaining "majority of the minority" stockholder approval (*e.g.,* parent-subsidiary mergers, *see Rosenblatt v. Getty Oil Co.,* 493 A.2d at 937; *Weinberger,* at 703; and *Citron v. E.I. Du Pont de Nemours & Co.,* Del.Ch., 584 A.2d 490 (1990)), and (b) transactions where shareholder approval is statutorily required yet does not involve a "majority of the minority" vote. *See, e.g., Van*

*Gorkom, supra* (merger with independent third party); and *Stroud v. Grace, supra* (charter amendment). In both sets of circumstances, the term "shareholder ratification" is used to describe the affirming shareholder vote; however, only the former category can fairly be analogized to "classic" shareholder ratification, in that it involves a condition ("majority of the minority" approval) that is not statutorily required.

That our courts have used the same term ("shareholder ratification") in such highly diverse sets of factual circumstances, without regard to their possible functional differences, suggests that "shareholder ratification" has now acquired an expanded meaning intended to describe any approval of challenged board action by a fully informed vote of shareholders, irrespective of whether that shareholder vote is legally required for the transaction to attain legal existence.

5. That holding is fully consistent with conventional agency doctrine and makes sense where the infirmity of the challenged board action is lack of board authority. *See Restatement of Agency (Second)* § 82 and Comment C. In that context, shareholder ratification "cures" that infirmity in a functional sense, because shareholder approval of the board's action supplies the authority that was lacking to begin with.

holder ratification is to alter the standard of review, *or* to shift the burden of proof, *or* both. Those cases further frustrate any effort to describe the "ratification" landscape in terms of a simple rule.

The ratification decisions that involve duty of loyalty claims are of two kinds: (a) "interested" transaction cases between a corporation and its directors (or between the corporation and an entity in which the corporation's directors are also directors or have a financial interest), and (b) cases involving a transaction between the corporation and its controlling shareholder.

■ Regarding the first category, 8 *Del.C.* § 144(a)(2) pertinently provides that an "interested" transaction of this kind will not be voidable if it is approved in good faith by a majority of disinterested stockholders. Approval by fully informed, disinterested shareholders pursuant to § 144(a)(2) invokes "the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction." *Marciano v. Nakash,* Del. Supr., 535 A.2d 400, 405 n. 3 (1987). The result is the same in "interested" transaction cases not decided under § 144:

> Where there has been independent shareholder ratification of interested director actions, the objecting stockholder has the burden of showing that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted.

*Michelson,* 407 A.2d at 224 (quoting *Kaufman v. Shoenberg,* Del.Ch., 91 A.2d 786, 791 (1952), at 791); *see also Gottlieb v. Heyden Chem. Corp.,* Del.Supr., 91 A.2d 57, 59 (1952); and *Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 501 (citing authorities reaching the same result in mergers involving fiduciaries that were not controlling stockholders).

■ The second category concerns duty of loyalty cases arising out of transactions be-

tween the corporation and its controlling stockholder. Those cases involve primarily parent-subsidiary mergers that were conditioned upon receiving "majority of the minority" stockholder approval. In a parent-subsidiary merger, the standard of review is ordinarily entire fairness, with the directors having the burden of proving that the merger was entirely fair. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 703. But where the merger is conditioned upon approval by a "majority of the minority" stockholder vote, and such approval is granted, the standard of review remains entire fairness, but the burden of demonstrating that the merger was unfair shifts to the plaintiff. *Kahn v. Lynch Communication Sys.,* Del.Supr., 638 A.2d 1110 (1994); *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 937–38 (1985); *Weinberger,* at 710; *Citron,* at 502. That burden-shifting effect of ratification has also been held applicable in cases involving mergers with a *de facto* controlling stockholder,[6] and in a case involving a transaction other than a merger.[7]

\* \* \*

To repeat: in only two circumstances has the Delaware Supreme Court held that a fully-informed shareholder vote operates to extinguish a claim: (1) where the board of directors takes action that, although not alleged to constitute *ultra vires,* fraud, or waste, is claimed to exceed the board's authority; and (2) where it is claimed that the directors failed to exercise due care to adequately inform themselves before committing the corporation to a transaction. In no case has the Supreme Court held that stockholder ratification automatically extinguishes a claim for breach of the directors' duty of loyalty. Rather, the operative effect of shareholder ratification in duty of loyalty cases has been either to change the standard of review to the business judgment rule, with the burden of proof resting upon the plaintiff, *or* to leave "entire fairness" as the review standard, but shift the burden of proof to the plaintiff. Thus, the Supreme Court ratification decisions do not support the defendants' position.

---

**6.** *See Kahn v. Lynch Communication Sys., supra* (merger between corporation and 43.3% stockholder-parent found to have exercised *de facto* control over subsidiary).

**7.** *See Stroud, supra* (challenge to the fairness of charter amendments proposed by a board of directors whose members were the corporation's controlling stockholders).

That being the present state of the law, the question then becomes whether there exists a policy or doctrinal basis that would justify extending the claim-extinguishing effect of shareholder ratification to cases involving duty of loyalty claims. *Van Gorkom* does not articulate a basis, and the parties have suggested none. The defendants rely solely upon the argument that *Weiss* and *Wheelabrator I* continue to be good law. That position requires this Court to revisit these decisions.

### 3.

As earlier noted, *Weiss* and *Wheelabrator I* are the sole authorities upon which the defendants' "claim extinguishment" argument rests. In those cases this Court extended *Van Gorkom* (which validated the extinguishment of a duty of care claim) to extinguish a duty of loyalty claim. Plausible as that extension might have been in 1989 and 1990 when *Weiss* and *Wheelabrator I* were decided, later Supreme Court decisions persuasively indicate that that view is no longer tenable.

In *Kahn v. Lynch Communication Sys., supra,* an "interested" cash out merger between a corporation and its *de facto* controlling stockholder was challenged as a breach of the directors' duty of loyalty. Had *Weiss* or *Wheelabrator I* been viewed as the correct ratification rule, the Supreme Court could have stated that the effect of shareholder ratification would be to extinguish the duty of loyalty claim. Instead, however, the Supreme Court held that in an interested merger with a controlling stockholder, the applicable judicial review standard is entire fairness, and shareholder ratification merely shifts the burden of proof on the fairness issue from the controlling stockholder to the challenging plaintiff. 638 A.2d at 1117. The *Kahn* Court disclaimed any suggestion that shareholder ratification obviates further judicial review, by noting that "the unchanging nature of the underlying 'interested' transaction requires careful scrutiny." *Id.* at 1116.

*Stroud v. Grace, supra,* is similarly instructive. There, as in *Weiss,* the claim was that certain charter amendments proposed by the board whose members were also the corporation's controlling stockholders, were unfair and a breach of the directors' duty of loyalty to the minority stockholders. The charter amendments were found to have been approved by the fully-informed vote of a majority of the minority stockholders. Had *Weiss* (which was also a charter amendment case) been viewed as the correct approach, the Supreme Court could simply have held, without further analysis, that the duty of loyalty claims were extinguished by the informed shareholder vote. But, the Court did not do that. It ruled that the ratifying vote "[shifted] the burden of proof to the [plaintiffs] to prove that the transaction was unfair," 606 A.2d at 90, and then proceeded to consider the plaintiffs' claim that the charter amendments were unfair because (*inter alia*) they were intended to interfere with the shareholder franchise.

From these decisions I conclude that in duty of loyalty cases arising out of transactions with a controlling shareholder, our Supreme Court would reject the proposition that the Delaware courts will have no reviewing function in cases where the challenged transaction is approved by an informed shareholder vote. *Kahn* makes explicit the Supreme Court's concern that even an informed shareholder vote may not afford the minority sufficient protection to obviate the judicial oversight role. Even if the ratified transaction does not involve a controlling stockholder, the result would not be to extinguish a duty of loyalty claim. In such cases the Supreme Court has held that the effect of shareholder ratification is to make business judgment the applicable review standard and shift the burden of proof to the plaintiff stockholder. See pages 1203–04, *supra.* None of these authorities holds that shareholder ratification operates automatically to extinguish a duty of loyalty claim.

■ For these reasons, and in the absence of any policy or doctrinal basis to conclude otherwise, I find that insofar as *Weiss* and *Wheelabrator I* hold that shareholder ratification extinguishes a duty of loyalty claim, those cases would not be regarded today as good law. If the contrary view is to prevail, its source must be the Delaware Supreme Court, which is the only Court that can authoritatively rationalize and bring needed co-

herence to this important area of our corporate law. Accordingly, the defendants' "claim extinguishment" argument, in the duty of loyalty context, must be rejected.

### C. The Appropriate Review Standard and Burden of Proof

Having determined what effect shareholder ratification does *not* have, the Court must now determine what effect it does have. The plaintiffs argue that their duty of loyalty claim is governed by the entire fairness standard, with ratification operating only to shift the burden on the fairness issue to the plaintiffs. That is incorrect, because this merger did not involve an interested and controlling stockholder.

■ In both *Kahn* and *Stroud*, the Supreme Court determined that the effect of a fully informed shareholder vote was to shift the burden of proof within the entire fairness standard of review. *Kahn*, 638 A.2d at 1117; *Stroud*, 606 A.2d at 90. Critical to the result in those cases was that the transaction involved a *de facto* (*Kahn, supra*) or *de jure* (*Stroud, supra*) controlling stockholder. That circumstance brought those cases within the purview of the ratification doctrine articulated in *Rosenblatt, supra, Bershad v. Curtiss–Wright–Corp.*, Del.Supr., 535 A.2d 840 (1987), and *Citron v. E.I. Du Pont de Nemours & Co., supra*, all involving mergers between a corporation and its majority stockholder-parent. The participation of the controlling interested stockholder is critical to the application of the entire fairness standard because, as *Kahn* and *Stroud* recognize, the potential for process manipulation by the controlling stockholder, and the concern that the controlling stockholder's continued presence might influence even a fully informed shareholder vote, justify the need for the exacting judicial scrutiny and procedural protection afforded by the entire fairness form of review.

**8.** That result is reached not only by process of elimination but also by application of 8 *Del.C.* § 144(a)(1). That statute provides that when a majority of fully informed, disinterested directors (even if less than a quorum) approve a transaction in which other directors are interested, the transaction will not be void or voidable by reason of the conflict of interest. Under § 144(a)(1), a ratifying disinterested director vote has the same procedural effect as a ratifying disinterested

■ In this case, there is no contention or evidence that Waste, a 22% stockholder of WTI, exercised *de jure* or *de facto* control over WTI. Therefore, neither the holdings of or policy concerns underlying *Kahn* and *Stroud* are implicated here. Accordingly, the review standard applicable to this merger is business judgment, with the plaintiffs having the burden of proof.[8]

The final question concerns the proper application of that review standard to the facts at bar. Because no party has yet been heard on that subject, that issue cannot be determined on this motion. Its resolution must await further proceedings, which counsel may present (if they so choose) on a supplemental motion for summary judgment.

\*     \*     \*

For the foregoing reasons, the defendants' motion for summary judgment (1) is granted as to the disclosure claim, (2) is granted as to the duty of care claim, and (3) is denied as to the duty of loyalty claims. Counsel shall submit an appropriate implementing form of order.

shareholder vote under § 144(a)(2). *See Marciano*, 535 A.2d at 405, n. 3. Here, it is undisputed that the merger was approved by the fully informed vote of WTI's disinterested directors. Those directors were fully aware of both the obvious conflict of the Waste designees and of the conflict of three other directors, created by the prospect of accelerated stock options and of future employment